IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MILLENNIUM VALIDATION SERVICES, INC., ) <br> ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> ALFRED THOMPSON, ) <br> ) <br> Defendant/Third Party Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GARY NIENABER, and JOSEPH MUSIKE, ) <br> ) <br> Third Party Defendants. ) <br> ) | C.A. No. 02-1430 (GMS) |

## MEMORANDUM

### I.     INTRODUCTION

Presently before the court are two motions; the March 8, 2005 Application To Confirm Arbitration Award by the defendant (D.I. 65), Alfred Thompson ("Thompson"), and the April 12, 2005 Motion To Vacate And/Or Modify Arbitration Award (D.I. 72) by the plaintiff, Millennium Validation Services, Inc. ("Millennium"). For the reasons discussed, the court will deny Millennium's motion and grant Thompson's motion.

### II.    BACKGROUND

Millennium is a Delaware corporation formed in 1999 by Thompson, Joseph Musike ("Musike"), and Gary Nienaber ("Nienaber") for the purpose of performing validation services. (D.I. 137, at JA1 032.) Prior to the formation of Millennium, Thompson, Nienaber, and Musike were employed at Fluor Daniel Enterprises ("Fluor"). (D.I. 20, at 4.) Musike resigned from Fluor to become the first employee of Millennium. (Id.) Nienaber and Thompson later joined Musike,

sharing equally in Millennium's total 1,500 shares. (D.I. 140, at JAI 168-75.) Upon the shareholders' request, Paul Cottrell, Esquire ("Cottrell") drafted a Shareholder's Agreement (the "Agreement") for Millennium, which was signed by Musike, Nienaber, and Thompson in November 1999. (D.I. 20, at 4.) On January 5, 2000, Musike was elected as Chief Executive Officer and Secretary for Millennium, and Nienaber was elected President. (D.I. 140, at JAI 185.) After conferring with Nienaber, Musike and Fluor, Thompson chose to remain working at Fluor, while retaining his status as a shareholder of Millennium. (D.I. 20, at 5.) During his tenure as a shareholder, Thompson granted Millennium a shareholder's loan in the amount of $26,000, upon the request of Nienaber and Musike. (Id. at 6.)

Approximately two years after the Agreement was executed, discussions arose concerning Thompson's withdrawal from Millennium. On November 20, 2001, a special meeting was convened at the offices of Tighe, Cottrell, & Logan, which included all three shareholders, Millennium's attorneys, Scott Messmore, Esquire ("Messmore") and Cottrell, and Thompson's attorney, James Owen, Esquire ("Owen"). (D.I. 141, at JAI 218; D.I. 20, at 7.) During the meeting, the parties discussed Thompson's withdrawal, but Thompson refused to withdraw at that time and left with his counsel at the meeting's conclusion. (D.I. 20, at 7.) According to the meeting minutes for November 20, 2001, signed by Musike and Nienaber, the shareholder's unanimously voted that good cause existed, pursuant to Section 12b[1] of the Agreement, to compel Thompson to withdraw as a

---

[1] Section 12b, "Withdrawal of a Shareholder," provides that "[a] Shareholder shall be compelled to withdraw from the Company (I) upon his becoming bankrupt, (ii) upon an adjudication of his incompetency, or (iii) for good cause, immediately following a unanimous vote by all of the other Shareholders that good cause exists. Good cause shall include, but not be limited to, a Shareholder's inability or unwillingness for any reason, whether voluntary or involuntary, to perform his duties for the Company." (D.I. 137, at JAI 038.)

shareholder. (D.I. 141, at JAI 219.) On November 20, 2001, Musike and Nienaber notified Thompson by letter that he was no longer a director, officer, or employee of Millennium. (Id. at JAI 228.) In response, Owen generated a letter stating that Thompson did not accept the actions taken at the "specially held meeting," because they were in violation of several laws and invalid. (Id. at JAI 232.) The letter further stated that Musike and Nienaber's invalid attempt to remove Thompson as a shareholder constituted a breach of fiduciary duty. (Id.)

Nevertheless, Millennium no longer considered Thompson a shareholder and, to facilitate a buy-out of his shares, requested that Anthony D'Amato ("D'Amato"), an "independent certified public accountant . . . then servicing the Company" compute the fair value of shares for the company. (D.I. 137, at JAI 037-38.) Paragraph 11 of the Agreement was to guide D'Amato's calculation, such that Millennium's fair value of shares was equal to "1) the total book value of all the Company's assets and property divided by 2) the number of shares of stock then issued and outstanding." (Id. at JAI 037.) This value was "binding upon all Shareholders absent a showing of fraud." (Id. at 038.)

On December 17, 2001, D'Amato sent Cottrell a letter that provided him with Millennium's book value. (D.I. 137, at JAI 018-21.) The letter also, "describe[d] how [D'Amato] calculated the valuation" and addressed some issues raised in Owens' letter to Cottrell regarding Thompson's removal. (Id. at JAI 018.) According to the letter, D'Amato's original valuation was $695,000, providing Thompson with a one-third share value of approximately $231,666. (Id. at JAI 020.) On December 19, 2001, Owen received a letter from Cottrell, explaining that "D'Amato's original book value of $695,000 . . . did not factor in . . . smaller adjustments. . . ." (D.I. 142, at JAI 274.) The letter also stated that the original value did not include the shareholders' unpaid salaries, and that

3

D'Amato included $129,000 that "simply did not exist in actuality." (Id. at JAI 275.) These "adjustments" caused D'Amato's valuation to decrease to $366,983.82. (Id.) Thompson's share value was also decreased to $122,327.94. (Id.) In an email to Owen, dated December 27, 2001, Messmore stated that Millennium's book value had again changed, increasing to $409,637.40, leaving Thompson with a one-third share value of $136,545.80. (Id. at JAI 278.) In response to D'Amato's many valuations, Thompson hired Geoff Langdon, C.P.A. who "was able to determine the book value of the corporate assets as of November 20, 2001 to be approximately $750,000.00," thereby, providing Thompson with a share value of $250,000. (Id. at JAI 309.)

On May 8, 2002, Millennium sent Thompson a letter regarding the purchase of his shares. According to the letter, D'Amato had calculated a share value of $250.81 and, therefore, the purchase price of Thompson's shares was to be $125,405.00. (D.I. 137-38, at JAI 050-052.) However, Millennium reduced the purchase price by $9,762.00, to charge Thompson with costs incurred in "responding and reacting to [Thompson's] actions during this process [the valuation and verification process] which was unnecessarily delayed and hindered by [those] actions." (D.I. 138, at JAI 051.) Thus, Millennium calculated the final price of Thompson's shares as $115,643.00. (Id.) The letter also purported to invoke an extended pay-out provision found in paragraph 12c(I)[2] of the Agreement, because Millennium did "not have sufficient capital available to permit" a lawful

---

[2] Paragraph 12c(I) of the Shareholder's Agreement, "Withdrawal of Shareholder" provides, in pertinent part, that "[i]f the Company does not have sufficient capital available to permit it lawfully to purchase any or all of such shares, within six (6) months of the Shareholder's withdrawal, the Company shall purchase all of the withdrawing shareholder's shares that the Company is legally unable to purchase at the Purchase Price per share provided in this Agreement on the following terms: (A) A down payment of twenty-five percent (25%) of the Purchase Price shall be paid upon the date of withdrawal; and (B) The balance of such purchase price shall be paid in equal monthly installments...."

purchase of Thompson's shares. (Id.) In accordance with the extended pay-out, Millennium enclosed a check for $28,910.75, with the balance of the purchase price to "be paid in 60 equal consecutive monthly installments of $1,593.40." (Id. at JAI 051.)

Sometime after the May 8th letter, Millennium discovered that Thompson was working under the employ of Global Turnkey Services ("GTKS") and suspended its buy-out of his shares in the company. (D.I. 138, at JAI 059.) Thompson had left Fluor on May 15, 2002 and, around that same time, became affiliated with GTKS. (D.I. 20, at 9.) While under GTKS' employ, Thompson, as Project Director, was able to secure a contract with B. Braun Medical Inc. ("B. Braun"), in Allentown, Pennsylvania. (D.I. 138-39, at JAI 082, 141.) According to GTKS records, Thompson worked on the B. Braun project from February 17, 2002 until at least July 12, 2002. (Id.) The February 12, 2002 contract between B. Braun and GTKS provided that GTKS was to perform consulting project services at B. Braun's manufacturing facilities in locations including Allentown and Bethlehem, Pennsylvania, and Cherry Hill, New Jersey. (D.I. 138, at JAI 062-075.)

By letter dated June 3, 2002, James S. Green, Esquire ("Green"), representing Millennium, advised GTKS that Thompson was in violation of a covenant not to compete contained in the Millennium Agreement.[3] (D.I. 20, at 9.) Pursuant to advice from counsel, Millennium promptly suspended all payments to Thompson and cancelled the May 9th check for $28,910.75. (D.I. 138, at JAI 059-060.) Millennium also discontinued payment of Thompson's $26,000 shareholder loan,

---

[3] Paragraph 22 of the Agreement, "Ex-shareholder's competing with the Company," provides that ". . . the departing Shareholder shall not, for a period of one year from the date of withdrawal, directly or indirectly perform or in any manner assist in the rendering of validation or engineering services . . . for any person, entity, firm or project site located within or having an address within a 200 mile radius of any Company office. . . ." (D.I. 138, at JAI 041-042.) It is Millennium's contention that Thompson's work on the B. Braun contract was a rendering of validation services and, therefore, a breach of the non-compete clause.

pending the outcome of its claim for breach of the non-compete clause. (Id.)

On July 24, 2002, Millennium filed a Verified Complaint,[4] claiming that Thompson was in "Breach of Contract," and was engaging in "Tortious Interference with Prospective Contractual Relations." (D.I. 1 Counts I and II.) In defense, Thompson asserted a counterclaim and third party complaint alleging, among other matters, a breach of fiduciary duty by Millennium's shareholders. (D.I. 20, at 13.) On October 1, 2004, the court held a pretrial conference, during which the parties discussed the possibility of settlement or mediation with a neutral arbitrator. (D.I. 63, at 38-39.) On October 25, 2004, the parties filed a stipulation (the "Stipulation") to arbitrate this matter, which cancelled the trial scheduled for October 12, 2004 and stated that "[t]he matter is referred, in its entirety, to a binding arbitration which will be governed by the parties agreement entered into on October 7 and October 8, 2004." (D.I. 64 ¶¶ 1-2.)

As alluded to above, the parties documented their agreement to arbitrate in two letters, dated October 7 and October 8, 2004. (See id.) In the October 7th letter, Thompson's attorney, Matthew S. Wolf, Esquire ("Wolf") explains that, "the parties hereby agree to submit the issues between and among the parties to binding arbitration." (D.I. 145, at JAI 395.) Wolf's October 7th letter also proposes that the parties submit "[t]he issues raised in the pleadings (Complaint, Answer, Counterclaim, Third Party Complaint, Reply to Counterclaim and Answer to Third Party Complaint) . . . to binding arbitration before the single arbitrator mutually agreeable to all parties." (Id.) Green confirmed Wolf's proposal by letter, on October 8, 2004, stating that, "this will confirm that we have reached an agreement to suspend the pending Federal Court case in favor of binding arbitration in

---

[4] Millennium originally filed its Verified Complaint in the New Castle County, Chancery Court. On August 22, 2002, Thompson removed the case to this court.

conformity with the items in your letter of October 7 lettered A though I, with the following changes/clarifications."[5] (Id. at JAI 399.)

Pursuant to the Stipulation, the parties met with an independent arbitrator on February 7 and February 8, 2005. (D.I. 65 ¶ 10.) On March 7, 2005, the arbitrator issued his Award, denying Millennium's claims for lost profits for breach of the non-compete and tortious interference. (D.I. 137, at JAI 002.) The arbitrator allowed Thompson's claim for share value, which required Millennium to pay Thompson the sum of $256,648 in exchange for the shares of Millennium capital stock. (Id. at JAI 003.) Thompson's share value amounted to $214,667.00, and $41,981.00 represented the accrued interest. (Id. at JAI 002.) The Award also ordered Millennium to pay Thompson's shareholder loan balance in the stipulated amount of $13,000.00, plus $2,442.00 of accrued interest. (Id.) The arbitrator reserved ruling on the parties' claims for attorneys fees and costs (both entitlement and quantification). (Id.)

On March 9, 2005, Millennium requested a "clarification, reconsideration and amendment" of the arbitrator's Award. (D.I. 145, at JAI 418.) On March 29, 2005, the arbitrator considered the request for clarification and responded that "Mr. Thompson's conduct did not constitute a breach of the Non-Compete provisions of the Shareholder's Agreement," and that there were "no grounds to amend or modify the Award." (D.I. 146, at JAI 004-005.) The payment of wages, owed to Thompson, as of November 20, 2001, was "given due consideration in the determination of Mr. Thompson's Share Value claim." (Id. at JAI 004.) The arbitrator also found that Millennium failed to establish entitlement to an extended pay-out of the purchase price pursuant to paragraph 12c of

---

[5] The minor modifications made by Green included the following: (1) that the arbitration not exceed two days; and (2) that no additional discovery would be conducted. (D.I. 145, at JAI 399.)

the Agreement and, further, that the issue was not even raised during the arbitration hearing. (Id. at JAI 005.)

### III. STANDARD OF REVIEW

"When parties move to confirm or vacate an arbitration award, 'the court's function in confirming or vacating a commercial arbitration award is severely limited.'" *U.S. Steel Mining Co., LLC v. Wilson Downhole Servs.*, No. 02:00CV1758, 2006 WL 2869535, at *2 (W.D. Pa. Oct. 5, 2006) (quoting *Mutual Fire, Marine & Inland Ins. Co. v. Norad Reins. Co. Ltd.*, 868 F.2d 52, 56 (3d Cir. 1989)). Arbitration awards are set aside only in "very unusual circumstances, . . ., and there is a strong presumption in favor of the arbitration award." *U.S. Steel*, 2006 WL 2869535, at *2 (internal quotations and citations omitted).

Although the parties in this case agreed to use the Federal Rules of Civil Procedure and the Federal Rules of Evidence to structure the arbitration proceedings (D.I. 137, at JAI 395,398) rather than the Federal Arbitration Act (the "FAA" or the "Act"), the Act is helpful in guiding the court's standard of review. "Under the FAA, a federal district court may vacate an arbitration award in the following [narrow] circumstances: (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." *Sherrock Bros. v. Daimler Chrysler Motors Co. LLC*, C.A. No. 06-CV-351, 2006 WL 2927636, at *4-5 (M.D. Pa. Oct. 12, 2006) (citing 9 U.S.C.

§ 10).

In addition to the statutory grounds, the Third Circuit has recognized that a district court may "vacate an arbitration award for manifest disregard of the law." *American Life Ins. Co. v. Parra*, 269 F. Supp. 2d 519, 526 (D. Del. 2003) (internal quotations omitted). The award, however, "must evidence more than a mere erroneous interpretation of the law." *Id*. Additionally, "[a] court may not vacate an arbitration award merely because it disagrees with the arbitrator's decision." *Environmental Indus. Servs. Corp. v. Souders*, 304 F. Supp. 2d 599, 601 (D. Del. 2004). Where an arbitrator fails to provide a rationale for the decision, a court should confirm the award if there are grounds for the arbitrator's decision found in the facts of the case. *Id.* "Thus, vacating or refusing to recognize or execute the arbitration award would be proper only if the record before the arbitrator reveals no support whatsoever for the arbitrator's determination. . . ." *Parra*, 269 F. Supp. 2d at 526 (internal quotations omitted). A district court may "affirm easily the arbitration award under this extremely deferential standard." *Dluhos v Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003)

## IV. DISCUSSION

Millennium contends that the court should vacate and/or modify the present arbitration award for the following five reasons: 1) the arbitrator exceeded his power to arbitrate the share value in rejecting the "binding valuation" set by Millennium's accountant; 2) the arbitrator's award contains an evident material miscalculation of figures; 3) the arbitrator refused to hear evidence pertinent and material to the controversy, to wit, evidence that Millennium invoked the extended buy-out provision of the Agreement, and the award evidences a manifest disregard for the law; 4) the arbitrator refused to consider Thompson's breach of the non-compete clause; and 5) the arbitrator exceeded his power on the issue of attorneys' fees and costs. (D.I. 73, at 9.) Below, the court

addresses each of Millennium's contentions in turn.

### A. The Agreement to Arbitrate

Millennium maintains that the arbitrator exceeded his power by arbitrating the dispute over its share value. While Millennium concedes that the dispute was submitted to arbitration, it contends that "the binding nature of D'Amato's calculations were not."[6] (D.I. 133, at 7.) Essentially, Millennium requests that the court find that part of the parties' dispute was not subject to binding arbitration.

"Arbitration is a matter of contract, and parties are bound by arbitration awards only if they have agreed to arbitrate a matter." *Teamsters Local Union No. 764 v. J.H. Merritt & Co.*, 770 F.2d 40, 42 (3d Cir. 1985). "The question of arbitrability – whether the parties contracted to arbitrate a particular grievance – is undeniably a legal issue for judicial determination." *United Indus. Workers v. Gov't of the Virgin Islands*, 987 F.2d 162, 167 (3d Cir. 1993). Upon mutual agreement to submit a matter to an arbitrator, the parties "are bound by his decision and may not later challenge his authority to resolve the claim." *Id.* at 168. "[B]ecause arbitrators derive their authority from the contractual agreement of the parties, a party may waive its right to challenge an arbitrator's authority to decide a matter by voluntarily participating in an arbitration and failing to object on the grounds that there was no agreement to arbitrate." *United Indus. Workers*, 987 F.2d at 168; *J.H. Merritt*, 770 F.2d at 43.

---

[6] The Agreement provides that Millennium's shares are to be valued by the company's certified public accountant, D'Amato, and that the valuation is "binding on all Shareholders absent a showing of fraud." (D.I. 133, at 8.) In light of this language, Millennium maintains that D'Amato's value of the company is binding, based on the fact that Thompson failed to show fraud in his valuation. (Id.)

In *J.H. Merritt*, the Third Circuit determined that there was a mutual agreement to arbitrate, where an employer voluntarily submitted a dispute to arbitration and was represented at the arbitration hearing by two high ranking officials. *J.H. Merritt*, 770 F.2d at 42. According to the court, this conduct "manifest[ed] a clear intent to arbitrate [the] dispute." *Id.* Therefore, the employer was bound by the arbitrator's decision. Likewise, in *United Industrial Workers*, the Union's conduct demonstrated an "unmistakable intent to arbitrate its dispute with the government" given that the Union demanded arbitration, sought a court order compelling the government to submit the dispute to binding arbitration, and participated fully in the arbitration with representation. *United Indus. Workers,* 987 F.2d at 168.

Here, Millennium errs in its assertion that there was no agreement to arbitrate the value of Thompson's shares. Like *J.H. Merritt* and *United Industrial Workers*, Millennium manifested a clear intent to submit the entire dispute to binding arbitration. A voluntary and mutual agreement was reached in the parties' October 7th and 8th letters, and memorialized in the Stipulation filed with the court on October 25, 2004, which stated that the "matter is referred, *in its entirety*, to a binding arbitration." (D.I. 64 ¶ 2) (emphasis added). The matter, in its entirety, included Thompson's request for a declaratory judgment as to the compensation for his shares in Millennium. (D.I. 20, at Prayer for Relief ¶ c.) In addition to being represented by competent counsel, Millennium also agreed to binding arbitration under the direction of its Chief Executive Officer and Secretary, Musike, and its President, Nienaber.

While Millennium relies heavily upon *Katz v. Feinberg*, 290 F.3d 95 (2d Cir. 2002), to support its contention that the arbitrator ignored the Agreement and exceeded his power, *Katz* is inapposite. (D.I. 73, at 11-12; D.I. 133, at 8.) In *Katz*, provisions of a detailed Purchase Agreement

11

stated that determination of the Final Share Purchase price was based upon the company's financial statements. *Katz*, 290 F.3d at 96. When the company accountant produced a value lower than expected, Katz sought to have the value declared invalid by an arbitration panel pursuant to the general arbitration clause found in the same Purchase Agreement. *Id.* Accordingly, the *Katz* arbitration arose pursuant to, and under, the Purchase Agreement. *Id.*

Unlike *Katz*, where the arbitration was conducted pursuant to a general arbitration clause contained within a broader Purchase Agreement, the arbitration in the present case stems not from the Agreement but, rather, from a stand-alone mutual arbitration agreement, memorialized in the Stipulation filed with the court. Thus, Millennium is mistaken in its assertion that paragraph 11 of the Agreement is binding upon Thompson's share valuation. Millennium voluntarily agreed to arbitrate the *entire* dispute, and is now bound by that Agreement.[7]

---

[7] Millennium maintains that the arbitrator made a material miscalculation, because it believes that D'Amato's share valuation was binding absent fraud. The court need not address this argument, given that the Agreement is not binding and this matter in its entirety was submitted to arbitration. By way of further explanation, *even if* D'Amato's valuation was binding, he did not follow the valuation procedures provided in the Agreement. Paragraph 11 provides that the fair value of shares "shall be calculated as an amount equal to 1) the total book value of all Company's assets and property divided by 2) the number of shares of stock then issued and outstanding." (D.I. 137, at JAI 037-38.) D'Amato testified that he "performed the computation based on the classical definition of book value," which is calculated as the "total assets, original cost of assets, less the depreciation or amortization, less the liabilities." (D.I. 148, at JAI 454.) D'Amato further testified that he did not compute the share value as it was "called for by the literal terms" of the Agreement. (Id.) Moreover, D'Amato failed to produce one definitive share valuation. He originally determined that Millennium's book value was $695,000. (D.I. 137, at JAI 020.) As of December 19, 2001, after D'Amato calculated the book value with liabilities, he changed the value to $366,983.82. (D.I. 142, at JAI 275.) In an email to Thompson's attorney, dated December 27, 2001, Messmore gave notification that Millennium's book value had again changed, increasing to $409,637.40. (Id. at JAI 278.) The arbitrator concluded that Millennium must pay Thompson $272,090.00. (D.I. 137, at JAI 003.) Of that total, Thompson's share value in Millennium amounted to $214,667. (Id. at JAI 002.) The arbitrator considered the payment of wages due to Thompson in his share value claim. (Id. at JAI 004.) Thus, the arbitrator's share value falls squarely among the multiple share valuations, and

### B.     Breach of the Non-Compete Clause

Millennium contends that the arbitrator ignored evidence of Thompson's violation of the non-compete clause.[8] (D.I. 73, at 17; D.I. 133, at 10.) The parties dispute whether or not Thompson's work pursuant to the GTKS contract with B. Braun was in violation of paragraph 22 of the Agreement. Thompson facilitated (D.I. 148, at JAI 467) and performed medical device validation services in Allentown, PA for B. Braun, which is within a 200-mile radius of Millennium. (D.I. 138, at JAI 082-83.) However, the record contains evidence which shows that the work GTKS performed for B. Braun did not involve the type of validation work that Millennium was qualified or equipped to perform. The record also demonstrates that, because of the aforementioned shortcomings, B. Braun would not have awarded its contract to Millennium.

Arthur Pennington Morse ("Morse"), Quality Assurance Director at B. Braun and the person responsible for all validation and quality systems, testified that he "never considered Millennium" for the medical validation work. (D.I. 148, at JAI 466, 469.) According to Morse, he contracted GTKS to "set up an overall validation program for validating the processes for manufacturing medical devices and equipment." (Id. at JAI 468.) Morse further testified that B. Braun is a medical device company, which has a different type of operation than a pharmaceutical company,

---

cannot fairly be characterized as a material miscalculation.

[8] While Millennium makes much of Thompson's work while employed by GTKS, it seemed unconcerned with his previous violation of the non-compete clause through his continued employment at Fluor. When asked whether Thompson was in violation of the restrictive covenant by working at Fluor the day after he was terminated from Millennium, Musike testified "I guess he was, yes." (D.I. 148, at JAI 460.) Also noteworthy, is the fact that Musike agreed that he did nothing about that violation. (Id.) It is hard for this court to believe that the arbitrator did not consider this testimony in making his finding that Thompson did not breach the non-compete clause of the Agreement.

13

which was Millennium's area of expertise. (Id.) Morse did not "recognize [Millennium] as having expertise to do the kind of work that was being done at . . . B. Braun." (Id. at JAI 469.) Morse explained that "[i]n pharmaceuticals, [there is] a much heavier dependency on chemistry, chemical reactions and chemistry of elements, components with each other," whereas medical devices are "heavier on materials, mechanical materials, how they interact with each other. . . ." (Id.) A person or company qualified in pharmaceutical validation, which requires mixing operations, may not necessarily be qualified to complete medical equipment validation, which requires assemblies. (Id. at JAI 470.)

The purpose of the ex-shareholder non-compete was to prohibit an ex-shareholder from competing with his former company by diverting business. In this case, the record shows that no business was diverted from Millennium, as it did not have expertise in medical device validation, and would never have been considered for the B. Braun contract. Therefore, even if Thompson did violate the non-compete clause, the arbitrator's finding would constitute harmless error, due to Millennium's failure to present record evidence of damages for lost business. In other words, given the evidence in the record and the narrow scope of review, the court will affirm the arbitrator's finding with respect to Thomspon's breach and Millennium's damages claim for the breach.

### C. Payment Over Time

Millennium next asserts that the arbitrator refused to hear evidence regarding the fact that it invoked the extended buy-out provision of paragraph12c(I) of the Agreement. This paragraph permits an extended payment period if "the Company does not have sufficient capital available to permit it lawfully to purchase any or all of such Shares, within (6) month of the Shareholder's

withdrawal.[9] (D.I. 137, at JAI 038.)

Other than its bare assertion of its lack of sufficient capital, however, there is no evidence in the record to support Millennium's position. In the May 8, 2002 letter, Millennium claimed that it sufficiently invoked paragraph 12 of the Agreement by stating: "[s]ince Millennium does not have sufficient capital available to permit it lawfully to purchase the Shares, and since the final purchase price for the Shares is at least $50,000 but less than $200,000, Millennium shall pay you the final purchase price, in accordance with the Agreement. . . ." (D.I. 138, at JAI 051.) This statement is the sum total of Millennium's evidence on the extended buy-out point. Further, Millennium appears to concede that the issue of payment over time was not addressed in arbitration, stating in its February 9, 2005 letter to the arbitrator requesting reconsideration that: ". . . although not specifically discussed at the hearing an award in favor of Mr. Thompson would not necessarily be payable as a final judgment now, and should be based upon the payment schedule set forth in Section 12. . . ." (D.I. 145, at JAI 401.) Bringing this issue to the arbitrator's attention following the close of evidence, serves only to frustrate Millennium's claim of entitlement to a an extended buy-out and confirms that the issue was neither addressed at the arbitration hearing nor adequately supported by evidence.

Given the foregoing, the court will not disturb the arbitrator's finding that Thompson is granted a lump sum payment and that "Millennium did not establish at the hearing[] its entitlement to an extended pay out of the purchase price . . . to be paid to Mr. Thompson. The issue was not

---

[9] While Millennium proposes that the arbitrator's failure to include the method of extended buy-out evidences a refusal to enforce the clear language of the Agreement, the court need not address this argument as it incorrectly assumes that the Agreement is controlling and binding upon the arbitration.

raised during the arbitration hearing and, therefore, sufficient evidence to consider such entitlement was not presented."[10]  (D.I. 137, at JAI 005.)

### D. Thompson's Claim for Attorney's Fees and Costs

Finally, Millennium maintains that the arbitrator has no authority to order a subsequent hearing to determine Thompson's claim for attorneys' fees and costs.[11]  (D.I. 73, at 20; D.I. 133, at 11.)  However, Millennium cites no authority, and the court cannot find any authority that binds an arbitrator to a time limit on an arbitration hearing agreed upon by the parties.  Indeed, analogizing the arbitrator's role to that of a federal judge, the court sees no practical reason to accept Millennium's assertion, because it is the parties who are bound by the stipulation, not the adjudicator.  *See* Black's Law Dictionary 1415 (7th ed. 1999) (a stipulation is "any agreement made by the attorneys engaged on opposite sides of a cause (especially if in writing), regulating any matter incidental to the proceedings or trial, which falls within their jurisdiction").  For example, parties to a certain case could stipulate to a two-day trial.  Following Millennium's argument to its natural

---

[10] The court need not address Millennium's belief that Thompson's award must be reduced to present value, given its failure to establish that Thompson's recovery included damages for loss of future earnings.  For this reason, *Steppi v. Stromwasser*, 297 A.2d 26, 27 (Del. 1972), does not apply to the instant matter.  In *Steppi*, the plaintiff produced evidence of a loss of future income, and the trial court attempted to reduce the jury award to present value for the projected loss of income.  *Id.*

[11] The court is not willing to address Millennium's assertion that Thompson has no right to a claim for attorney's fees and costs, given that the entire matter was submitted to binding arbitration.  In other words, the agreement to arbitrate reached by the parties and confirmed in Green's October 8, 2004 letter submitted to arbitration "[t]he issues raised in the pleadings in the captioned action (Complaint, Answer, Counterclaim, Third Party Complaint, Reply to Counterclaim and Answer to Third Party Complaint)."  (D.I. 145, at JAI 395.)  The pleadings contain Thompson's clearly stated claims for "attorneys' fees and costs incurred in prosecuting the matter."  (D.I. 20, at 15, 18.)  Accordingly, Millennium's assertion is mistaken, as the parties have agreed to submit Thompson's claim for attorney's fees and costs found in the pleadings to arbitration.

conclusion, at the end of the two-day period, the trial would be over, even if the parties hadn't presented all of their evidence. In reality, trials do not operate as Millennium would suggest. If, for some reason, the judge determines that an aspect of the litigation could be disposed of at a different time, he or she would not be bound by the parties' two-day trial stipulation. That is, the judge would be able to lengthen the trial. Thus, Millennium's point that an arbitrator exceeds his authority by requesting the parties to appear before him again for the attorney's fees and costs aspect of the litigation is not well taken by this court. In light of the foregoing discussion, and the dearth of authority provided by Millennium, the court cannot agree that the arbitrator exceeded his authority by requesting the parties to appear for another hearing regarding attorney's fees and costs.[12]

Dated: November ___, 2006

_____
UNITED STATES DISTRICT JUDGE

---

[12] One practical reason an arbitrator may defer ruling on attorney's fees and costs is so that he or she can afford the litigants the opportunity to request the district court to confirm or vacate/modify the arbitration award. Because additional attorney's fees and costs could be associated with making these motions, it makes sense for the arbitrator to defer consideration of any requests for attorney's fees and costs until after his or her award has been affirmed by the district court.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MILLENNIUM VALIDATION SERVICES, INC., )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>ALFRED THOMPSON, )<br>)<br>Defendant/Third Party Plaintiff, )<br>)<br>v. )<br>)<br>GARY NIENABER and JOSEPH MUSIKE, )<br>)<br>Third Party Defendants. )<br>) | C.A. No. 02-1430 (GMS) |

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

    1.    The Plaintiff's Motion to Vacate And/Or Modify Arbitration Award (D.I. 65) is DENIED.

    2.    The Defendant's Application To Confirm Arbitration Award (D.I. 72) is GRANTED.

Dated: November 3, 2006                          /s/ Gregory M. Sleet
                                                                              UNITED STATES DISTRICT JUDGE